UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UAW-GM CENTER FOR HUMAN RESOURCES,

   Plaintiff,

                 Case number 06-10450
v.                 Honorable Julian Abele Cook, Jr.

WORKPLACE BENEFITS, LLC, and DD & SF
INVESTMENTS, INC., a/k/a WORKPLACE
OPTIONS, INC.,

   Defendants .

ORDER

This case involves a dispute between the Plaintiff, UAW-GM Center for Human Resources, and the Defendants, Workplace Benefits, LLC, and DD & SF Investments, Inc., a/k/a Workplace Options, Inc., over the efficacy of a contract. At issue before the Court are two motions. The first motion was submitted by the UAW-GM who seeks to obtain a variety of forms of relief (to wit, declaratory judgment, dismissal or summary judgment) against the Defendants.[1] The second motion, which was filed on behalf of the Defendants, seeks permission from the Court to file a surreply to the UAW-GM's dispositive motion.[2]

---

[1] This motion is most appropriately evaluated as a request for summary judgment under Fed.R.Civ.P. 56. Hence, the Court will not address the Fed.R.Civ.P. 12(b)(6) standard, as requested by the UAW-GM.

[2] For the reasons that were set forth on the record during a hearing on April 18, 2007, the Defendants' request is granted. The Court accepts the surreply that was filed by the Defendants on April 16, 2007. The balance of this order will be devoted exclusively to an evaluation of the UAW-GM's pending dispositive motion.

1

For the reasons that have been set forth below, the Court will grant, in part, the UAW-GM's motion for the entry of a summary judgment.

I.

On October 1, 2002, the Voucher Corporation, the parent company of the Defendant, Work/Life Benefits, entered into a contract with the UAW-GM, a Michigan non-profit organization, to provide resource and referral services to those General Motors Corporation employees who held membership in the United Auto Workers Union. This contract contained a clause, "Term and Termination: Time for Performance," which reads:

> This Agreement shall commence as of the Effective date [October 1, 2002] and shall continue until September 30, 2004.
>
> Notwithstanding anything to the contrary contained herein, either party may terminate this Agreement, with or without cause, as to all or any portion of the Project Deliverables upon at least one hundred and twenty (120) days prior written notice to Contractor The Termination Notice shall specifically identify the Terminated Project Deliverables and the effective date of such termination, which termination date shall not be less than one hundred and twenty days subsequent to the delivery of the Termination Notice.

On January 30th of the following year, the Voucher Corporation changed its name to Accor Services North America. On September 28, 2004, Denise Word, an employee of Work/Life, sent an email with a subject line, "Letter of extention [sic]," to the UAW-GM which contained the following message:

> We are aware, of course, that your intention is to put the child care/elder program out for bid very soon. However, our agreement with you ends this Thursday, September 30. We are requesting that you provide a letter to us, expressing your desire to that we remain your service vendor beyond this date. You may send this communication via US mail, fax or email to either Jim Kinville, CEO, or to me. Thank you for your prompt attention.

On the following day, Tom Hill, the UAW-GM's Chief-Financial Officer and a recipient of Word's email, responded in the following manner:

> Per your email request below, please accept this as our written confirmation and commitment that we wish to continue to retain the services of Work/Life to provide our ongoing Child and Elder Care Resource and Referral Program services as well as our hotline program. The specific services and deliverables will continue as is outlined in our agreement that is expiring on September 30, 2004.
>
> As you noted, we are currently putting these services out for competitive bid. We plan to solicit a bid from [Work/Life], among others. We wish to extend our current agreement with [Work/Life] until such time as this bid process is complete and a vendor selection is made.
>
> This will confirm that we also understand and agree to the pricing schedule for this extension period beginning October 1, 2004, as outlined in the 2004/2005 budget document you emailed to me on September 8th.
>
> Please feel free to call me if you have any questions or require any additional document of our agreement.

(UAW-GM's Brief, Exhibit 4)

On May 1, 2005, Accor Services entered into a "Contribution Agreement" with the Defendant, Workplace Benefits, formerly known as Work Life. According to Accor Services, it had intended to contribute all of its "work-life" assets to Workplace Benefits. However, Accor Services maintains that its contract with the UAW-GM was "inadvertently omitted from the list of 115 contracts listed in Schedule 4.3.15" of the Contribution Agreement. (Workplace Benefits' Brief at12).

Work/Life continued to perform services for the UAW-GM after the agreed upon September 30, 2004 termination date. However, during this period of time, the UAW-GM publicly solicited requests for bids on a contract that would provide essentially the same type of services to its membership that had been rendered by Work/Life. On May 3, 2005, Work/Life sent a letter to UAW-GM on its letterhead, in which it stated that "Work/Life Benefits is joining forces with [the Defendant] Workplace Options to create the industry's preeminent work/life service provider." (UAW-GM's Brief, Exhibit 12). Approximately two weeks later (May 20, 2005), Work/Life,

despite having submitted a bid, received the following letter from the UAW-GM, in which it was informed that another applicant had been chosen:

> The UAW-GM Center for Human Resources has completed its evaluation of the proposals received on the above project and has selected O/E Learning, Inc. to pursue a contract/purchase order for this project.
>
> Our Work and Family program administrators will contact you shortly to arrange for an orderly transition of contract services to the new vendor. Your firm's name will remain on our active bid list for future projects. We thank you for your time and interest in preparing a proposal.

(UAW-GM's Brief, Exhibit 5)

On August 10, 2005, Word transmitted an email to the UAW-GM, requesting that checks for the services performed under the parties contract be forwarded to Workplace Benefits in Charlotte, North Carolina. In her message, she stated that "our finance department moved to North Carolina and it would be easier if the checks were mailed directly to them." (UAW-GM's Brief, Exhibit 15) In response, the UAW-GM stated that it "noticed you want the check to be payable to [Workplace Benefits] instead of [Work/Life]. That's fine, but be sure that the invoices come from [Workplace Benefits] on their letterhead. We cannot make the check payable to [Workplace Benefits] if the invoices continue to come from [Work/Life]." (*Id.*) On August 11th, she sent a "revised format"to the UAW-GM for invoicing, explaining that "the address for payment has been changed to [Workplace Benefits] in North Carolina. However, this is the legal name for the combined corporation of [Work/Life] and WPO, and we do not have a logo for this new entity." (UAW-GM's Exhibit 15.) The UAW-GM responded, "I guess we can live with this invoice format for the short term." (Id.) A check in the amount of $881,000 was forwarded by the UAW-GM to Workplace Benefits shortly thereafter. (Workplace Benefits Brief, Exhibit 9.)

Subsequent to a meeting among the parties on October 12th which was ostensibly designed

4

to discuss the transition of its services to the successful applicant, the UAW-GM asked Work/Life to relinquish its database and 1-800 telephone number. However, Work/Life refused, contending that the requested data base and telephone number were its intellectual properties. When this issue was not satisfactorily resolved, Work/Life sent a letter to the UAW-GM on January 11, 2006 which stated:

> [Work/Life] has not received official notice per our contract that UAW-GM has determined an effective date to end portions of our vendor relationship or what portions will be ended. In fact, we are fully staffed to continue our service to UAW-GM employees. . . . Accordingly to our contract, a specific formal notification process is outlined. . . .The contract specifically indicates that there is a 120 day transition period from the date of notice.

This lawsuit followed.

## II.

In 1986, the Supreme Court opined that "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupportable claims or defenses . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). At the same time, the language within Federal Rule of Civil Procedure 56© provides that a motion for a summary judgment should be granted only if a party "show[s] that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." In this case, the burden is on the UAW-GM, as the movant, to demonstrate the absence of a genuine issue of a material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In evaluating the merit of a summary judgment motion, the Court must examine all pleadings, depositions, answers to interrogatories, admissions, and affidavits in a light that is most favorable to the non-moving party. Fed. R. Civ. P. 56(c); *see United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Boyd v. Ford Motor Co.*, 948 F.2d 283, 285 (6th Cir. 1991); *Bender v.*

*Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984). Thus, it is the responsibility of the Court to determine "whether . . . there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

A dispute is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Therefore, a summary judgment must be entered if (1) the submitted evidence in support of the dispositive motion clearly suggests that the contested matter is "so one-sided that [the proponent] must prevail as a matter of law," *id.* at 252, or (2) the opponent fails to present evidence which is "sufficient to establish the existence of an element essential to its case, and on which it will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. Upon such a showing, the non-moving party must act affirmatively in order to avoid the entry of a summary judgment. Fed. R. Civ. P. 56(e). However, it is important to note that the presentation of a mere scintilla of supporting evidence is not a sufficient defense. *See Anderson*, 477 U.S. at 252, *quoted in Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). In fact, "[i]f the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted).

### III.

Under Michigan law, the primary goal of contract interpretation is to enforce the parties' intent. *Central Jersey Dodge Truck Center, Inc., v. Sightseer Corp.*, 608 F.2d 1106, 1108 (6th Cir. 1979). Language in a contract is to be given effect according to its obvious meaning, and the court is to read the agreement as a whole when attempting to apply the plain language of the contract. *Old Kent Bank v. Sobczak*, 243 Mich. App. 57 (2000). When the language used is clear, an interpretation by the court and its enforcement is limited to that language. *Michigan Mut. Ins. Co.*

*v. Dowell*, 204 Mich. App. 81 (1994). The parties are presumed to understand and intend that which the language employed clearly states. *Burkhardt v. Bailey*, 260 Mich. App. 636 (2004). In addition, "every word in the agreement must be taken to have been used for a purpose, and no word should be rejected as mere surplusage if the court can discover any reasonable purpose thereof which can be gathered from the whole instrument." *McIntosh v. Groomes*, 227 Mich. 215, 218 (1924). Finally, if the language within the contract is clear and unambiguous, then its meaning is a question of law. Similarly, the issue of whether certain language within a contract is ambiguous is also a question of law. However, if language is found to be ambiguous, the meaning of that language becomes a question of fact. *NILAC Intern. Marketing Group v. Ameritech Services*, Inc., 362. F.3d. 354 (6th Cir. 2004).

In the case at hand, the parties agreed that their respective obligations under the contract would begin on October 1, 2002 and continue until September 30, 2004. In the next paragraph, they collectively agreed that either party could terminate their contractual responsibilities "upon 120 days prior written notice."

The language of this agreement is quite clear that the 120 day notice provision had been included to provide the parties with an option to terminate their contractual obligations prior to September 30th in 2004. It is undisputed that the terms of the contract were extended beyond its initial 2004 term by an email on September 29, 2004 and by the parties' post- September 30, 2004 conduct. However, the parties disagree on whether the contract, as extended, required a 120 day notice of termination. The UAW-GM contends that after the extension, the contract was terminable at will or for a fixed duration (i.e. until the UAW-GM bid process was complete and it had chosen another provider). Workplace Benefits has a different view, asserting that the entire contract was

extended beyond the initial 2004 term which, in turn, included the 120 day notice provision. Where no minimum duration is stated in a contract, "the general rule appears to be that it is terminable at will by either party." *Aaron E. Levine & Co. v. Callkraft Paper Co.*, 429 F.Supp. 1039, 1050.

This case involves many disputed facts, including the intent of the parties regarding the extension of their contract. Unlike the original contract, which provided the parties with an ample opportunity to review their prospective obligations before signing, the extended agreement appears to have been done hastily through an exchange of emails between their representatives. As a result, the language in the email messages is less clear than the wording within the contract.

Nevertheless, the September 29, 2004 email message does make it clear that the parties' contractual obligations will continue "as is outlined in our agreement." Thus, the 120 day notice provision in the original contract is clearly a provision which was designed to address the parties' ability to make an early termination of their contractual duties. Furthermore, there is no language within the contract or in the text of the above-referenced emails which suggest that the 120 day notice provision would apply until such time as the bidding process had been completed. As such, the Court concludes that the interpretation by Workplace Benefits' to the 120 day notice provision as it relates to the extended contract is neither correct nor supported by the law.

Workplace Benefits also appears to argue – without justification – that it did not have sufficient notice that the UAW-GM was going to terminate the contract, as extended. However, an examination of the email message which resulted in the extension of the contract reveals that the UAW-GM had clearly indicated its intention to put "these services out for competitive bid." Where no minimum duration has been stated in a contract, "the general rule appears to be that it is terminable at will by either party." *Levine*, 429 F.Supp.1039 (E.D. Mich. 1976), *see also First*

8

*Flight Associates, Inc. V. Professional Golf. Co., Inc.*, 527 F.2d 931 (6th Cir. 1975). Therefore, the Court finds that the contract, as extended, was terminable at will. On this narrow issue, a partial summary judgment shall be, and is, granted to the UAW-GM.

IV.

In its summary judgment motion, the UAW-GM also asks the Court to find that Workplace Benefits' has no right to sue under the contract. Workplace Benefits takes issue with this argument, contending that it is the recipient of the efforts by Work/Life – despite the "inadvertent [omission of the UAW-GM] from the list of 115 contracts listed in Schedule 4.3.15" of the Contribution Agreement – to consummate a complete transfer of its assets in May 2005.

In its counter-argument, the UAW-GM asserts that even if the Court accepted this contention by Workplace Benefits, such an assignment would not have been valid under the terms of the parties' contract which required the submission of a prior written notice. Under the heading "Successors and Assigns," the contract states:

> This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors, assigns, and legal representatives provided, however, that the rights, duties, and privileges of either party hereunder may not be assigned or otherwise transferred, in whole or in part, without the prior written consent of the other party; provided that Contractor shall have the right to assign any or all of its rights, duties, or priviledges [sic] to one or more of its subsidiaries without prior written consent of UAW-GM.

(Contract, ¶13 at 6)

Workplace Benefits responds by asserting that this "anti-assignment" provision does not apply

in this situation, noting that it is a subsidiary of Accor.[3] However, the UAW-GM, in addition to challenging Workplace Benefits' status as a subsidiary of Accor, also submits that it neither consented to the claimed assignment nor was ever asked to provide a written consent. It also points to the "anti-waiver/no-modification" provision in the contract which, in its opinion, supports its argument on this issue.[4] However, in 2003, the Michigan Supreme Court correctly declared that parties are free to mutually waive or modify a written agreement, notwithstanding a written modification or anti-waiver clause, because of their freedom to contract. *Quality Products and Concepts Co. v. Nagel Precision, Inc*, 469 Mich. 362 (2003). Mutuality is the centerpiece when determining modifications to a contract. Here, it is clear to this Court that the exchange of emails between the parties, in addition to the payment of over eight hundred thousand dollars to Workplace Benefits, constitutes sufficient evidence of a valid assignment which justifies a rejection of these arguments by the UAW-GM.

V.

Accordingly, and for the reasons set forth above, the UAW-GM's motion for summary judgment is granted in part and denied in part. The Court finds that the contract between the UAW-GM and Work/Life was extended, and that once it was extended, it was terminable at will. The

---

[3] The provision also states that "Contractor shall have the absolute right to assign any or all of its rights. . . to one or more of its subsidiaries without the prior written consent of UAW-GM."

[4] The Contract, in paragraph 13, stated:
Entire Agreement: Modification. This Agreement sets forth the entire agreement and understanding of the parties with respect to the subject matter hereof and supersedes all prior oral and written agreements and understandings thereto. No representation, promise, inducement, or statement of intention has been made by either party which is not set forth in this Agreement and neither shall be bound by or liable for any alleged representation, promise, inducement, or statement of intention not so set forth.

10

Court also finds that there has been a sufficient showing that Workplace Benefits was assigned Work/Life's rights under the parties' contract. For this reason, the UAW-GM is neither entitled to a dismissal nor the entry of a summary judgment relating to Workplace Benefits' counterclaim.

IT IS SO ORDERED.

Dated: September 26, 2007       s/ Julian Abele Cook, Jr.
      Detroit, Michigan      JULIAN ABELE COOK, JR.
                       United States District Court Judge

## Certificate of Service

I hereby certify that on September 26, 2007, I electronically filed the foregoing with the Clerk of the Court using the ECF system, and I further certify that I mailed a copy to the non-ECF participant(s).

                                           s/ Kay Alford
                                           Courtroom Deputy Clerk